WESTERMAN BALL EDERER MILLER
  & SHARFSTEIN, LLP
170 Old Country Road, Suite 400
Mineola, New York 11501
(516) 622-9200
Jeffrey A. Miller, Esq. (JM 6352)
Eric G. Waxman III, Esq. (EW 0498)
*Counsel for Madison Realty Capital L.P. and*
*67500 South Main Street, Richmond LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| SCARBOROUGH-ST. JAMES CORPORATION, et al., | Case No. 03-17966 (JMP) and Case No. 03-17967 (JMP) (Jointly Administered) |
| Debtors. | |

---------------------------------------------------------------------X

| | |
|---|---|
| MADISON REALTY CAPITAL, L.P. and 67500 SOUTH MAIN STREET, RICHMOND LLC, | |
| Plaintiffs, | Adv. Pro. No. 09-01260 (JMP) |
|    - against – | |
| SCARBOROUGH-ST. JAMES CORPORATION, | |
| Defendant. | |

---------------------------------------------------------------------X

**Plaintiffs' Motion To Stay Arbitration, Vacate A State Court Temporary Restraining Order, And For Injunctive Relief Consistent With This Court's DIP Order Pending A Determination Of The Underlying Adversary Proceeding**

Plaintiffs Madison Realty Capital L.P. ("Madison") and 67500 South Main Street, Richmond LLC ("67500") respectfully submit this motion for an order staying an arbitration proceeding, vacating a state court temporary restraining order and issuing injunctive relief consistent with this Court's DIP Order (defined below) pending a determination of the underlying adversary proceeding.

## INTRODUCTION

1. As approved by this Court's Order dated April 20, 2007 (the "DIP Order", attached as Exhibit "A"), Madison provided $3.1 million in debtor-in-possession ("DIP") financing to Chapter 11 debtor Richmond Realty Limited Partnership ("RRLP"), the former owner of a shopping center in Michigan (the "Shopping Center"). As part of the loan transaction, Madison obtained a DIP mortgage in the Shopping Center, which was recorded. The DIP Order expressly provided that Madison had a superpriority claim and first priority lien in all of RRLP's assets (which included the Shopping Center and the rents). *See* DIP Order at ¶ 6(c).

2. At the time the DIP Order was entered, RRLP was party to a then-unrecorded "net lease" (the "Intermediate Agreement", attached as Exhibit "B") with its affiliate, Chapter 11 debtor Scarborough St. James Corp. ("SSJC"), pursuant to which SSJC "rented" the Shopping Center from RRLP.

3. The DIP Order provided that Madison's interest as DIP lender was senior to any and all present and future liens, claims, interests, and encumbrances in the Shopping Center. DIP Order at ¶ 6(c). Thus, the DIP mortgage was senior to the Intermediate Agreement. That is what Madison bargained for, and that is what this Court ordered. If that was not the case (i.e., if the DIP mortgage was subordinate to the Intermediate Agreement), Madison never would have provided the DIP loan.

4. The DIP loan went into default, and Madison commenced proceedings under Michigan law to foreclose on the Shopping Center in the fall of 2008. Apparently recognizing that such a foreclosure would extinguish the Intermediate Agreement, SSJC (not RRLP) brought an adversary action in this Court seeking to enjoin the foreclosure. This

Court denied that request, Madison foreclosed on the Shopping Center, the Intermediate Agreement was extinguished, and Madison assigned its bid to its designee, 67500.

5. RRLP did not redeem the Shopping Center within the redemption period provided by Michigan law. 67500 is now the owner of the Shopping Center in fee simple, free of all liens, claims, encumbrances and interests.

6. After expiration of the redemption period, 67500 engaged a property manager, Finsilver/Friedman Management Corp. ("FFMC"), which notified the Shopping Center tenants of the change of ownership and management and provided rent remittance instruction to tenants. Exhibit "C".[1]

7. Unfortunately, SSJC continued with its campaign to frustrate plaintiffs' rights. First, SSJC sought the intervention of the local police to deny the new property manager access to the Shopping Center.

8. Then, in blatant circumvention of this Court's <u>exclusive</u> jurisdiction, SSJC commenced an arbitration proceeding before JAMS (invoking an arbitration clause in the extinguished Intermediate Agreement) and obtained a TRO from the New York County Supreme Court, ostensibly in support of the arbitration, which enjoined Madison and 67500 from any contact with the Shopping Center or its tenants or from collecting the rents to which 67500 is entitled.

9. SSJC's state court petition did not recognize the senior position of Madison's DIP mortgage, nor did it acknowledge this Court's exclusive jurisdiction over the dispute pursuant to the express terms of this Court's DIP Order.

10. SSJC continues to manage the Shopping Center without accounting to anyone. SSJC has not paid or remitted any monies to Madison or 67500 pursuant to the Intermediate

---

[1] This letter also describes FFMC and its capabilities.

Agreement (which SSJC claims is still extant) or otherwise. In addition, SSJC acknowledged in its state court petition that it has not paid real estate taxes for the Shopping Center.

**RELIEF SOUGHT**

11. Pursuant to Fed. R. Bankr. P. 7065 and 9013, and 28 U.S.C. §§ 157, 1334, 1408, 1409 and 1450, the Standing Order of Referral of Cases to Bankruptcy Judges for the Southern District of New York dated July 19, 1984 (Ward, Acting C.J.), and 11 U.S.C. §§ 105(a), 362, 363, 364, 1109, 1141, and 1142, plaintiffs respectfully request that the Court issue an order staying the improper arbitration pending further order of the Court, and preliminarily enjoining SSJC from interfering with 67500's rights as owner of the Shopping Center including, without limitation, by contacting tenants at the Shopping Center or collecting rents at the Shopping Center. In the alternative, if SSJC is permitted to continue to manage the property and collect rents and other income, then plaintiffs respectfully request that the Court order SSJC to (i) pay only the ordinary expenses of the Shopping Center pursuant to a budget that is either agreed-upon by the parties or approved by the Court; (ii) pay any excess monies up to $635,464.08 per year (the amount owed by SSJC for rent under the Intermediate Agreement, assuming it is still extant) to 67500; and (iii) pay any excess monies after that into escrow pending further order of the Court.

12. By law, the state court TRO expired on June 20, 2009 (10 days after the state court proceeding was removed). To the extent that it remains effective as of the time of the hearing and determination of this motion, then Madison and 67500 request that this Court vacate the state court TRO in its entirety.

13. Respectfully, this narrow relief will protect the property, and preserve the parties' respective positions while this matter is litigated before this Court, which, as stated, has exclusive jurisdiction.

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Sale/Leaseback and the Intermediate Agreement**

14. SSJC previously owned the shopping center located at 67300-67500 Main Street, Richmond, Michigan (the "Shopping Center").

15. Upon information and belief, in 1985, SSJC entered into a sale/leaseback transaction with its affiliate, Richmond Realty Limited Partnership ("RRLP").

16. By this transaction, SSJC sold the Shopping Center to RRLP and then "rented" the property from RRLP pursuant to an Intermediate Net Lease, which was amended in June 2006 by an Amended and Restated Intermediate Agreement (the "Intermediate Agreement", a copy of which is attached as Exhibit "B").

17. SSJC did not and does not occupy space at the Shopping Center. The Intermediate Agreement was not a true bona fide lease of real estate. Rather, it was a disguised financing transaction.

18. The Intermediate Agreement was not recorded in the Macomb County, Michigan real property records until April 17, 2009. *See* Liber 19749, page 632.

**The Bankruptcies**

19. On December 17, 2003, SSJC filed a petition under Chapter 11 of the United States Bankruptcy Code in this Court.

20. On November 22, 2006, RRLP filed a petition under Chapter 11 of the United States Bankruptcy Code in this Court.

21. RRLP's bankruptcy was jointly administered with that of SSJC until RRLP's case was dismissed on December 4, 2008.

22. SSJC's bankruptcy case is still pending, and SSJC is operating pursuant to a Plan of Reorganization confirmed by this Court on June 11, 2008 (the "Plan").

**The DIP Order**

23. At the time of RRLP's bankruptcy, RRLP owned the Shopping Center.

24. In conjunction with the bankruptcies of RRLP and SSJC, Madison provided debtor-in-possession ("DIP") financing to RRLP in the amount of $3,100,000.00. This Court approved the DIP loan by Order dated February 21, 2007, which was amended by this Court's Order dated April 20, 2007 (the "DIP Order"), a copy of which is attached as Exhibit "A".

25. The DIP Order granted the debtors' joint motion dated January 25, 2007 ("DIP Motion") for an order authorizing the post-petition secured financing. A copy of the DIP Motion is attached as Exhibit "D". The DIP Motion expressly contemplated the assignment of, and security interest in, all current and future leases, rents, and other income related to the Shopping Center. *See* DIP Motion at ¶ 45 and Exhibit A, Loan Agreement, at page 1.

26. Pursuant to the DIP Order, RRLP executed and delivered to Madison a promissory note in the original principal amount of $3,100,000.00 (the "DIP Note"), a copy of which is attached as Exhibit "E".

27. The DIP Note was secured by a mortgage on the Shopping Center (the "DIP Mortgage"), a copy of which is attached as Exhibit "F".

28. The DIP Mortgage was recorded in the real property records of Macomb County, Michigan on May 14, 2007. *See* Liber 18700, page 317.

29. The DIP Note and obligations were also secured by an unconditional security interest in the Shopping Center's leases and rents and by a perfected priming lien, senior in all respects to any and all present and future liens, claims, interests or encumbrances, if any, "including, without limitation, any and all pre-petition and post-petition liens and security interests held by Warren Bank, Carmen, Scarborough, FRRC, MCANY II, BLG, C&R or RGE, as further described in the DIP Loan Agreement." *See* DIP Order at ¶ 6(c).

30. The DIP Order was recorded in the real property records of Macomb County, Michigan on May 14, 2007. *See* Liber 18700, page 298.

31. Pursuant to the DIP Order, this Court retained "exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order . . . or other injunctive relief requested." *See* DIP Order at ¶ 17(b).

32. The DIP Order also provided that the Court would maintain jurisdiction even after a dismissal of RRLP's bankruptcy case "for purposes of enforcing the liens, security interests and Superpriority Claims of the Lenders, as the case may be." *Id*. at ¶ 23.

33. Pursuant to SSJC's Plan, this Court also retained jurisdiction to determine all motions and matters filed after the effective date of the Plan, to determine all controversies that may arise in connection with the enforcement of the Plan and in connection with any agreement made as part of the Plan, and to hear other matters related to the Plan and not inconsistent with Chapter 11. *See* Order Confirming the Plan (attached as part of Exhibit "G") at p. 4 and Plan (attached as part of Exhibit "G") at pp. 20-22.

### The Defaults, the September 2008 Agreement and the Foreclosure

34. The DIP loan went into default, and Madison initiated foreclosure proceedings under Michigan law. The foreclosure sale was originally scheduled for September 26, 2008.

35. On September 24, 2008, SSJC and Madison entered into an agreement (the "September 2008 Agreement") which, among other things, postponed the foreclosure sale for four weeks to allow SSJC time to try to satisfy its obligations to Madison. A copy of the September 2008 Agreement is attached as Exhibit "H".

36. Pursuant to the September 2008 Agreement, SSJC waived all claims against Madison including all claims relating to Madison's enforcement of the loan documents and Madison's rights to collect the rents at the Shopping Center. *See* September 2008 Agreement at ¶ 5.

37. On or about October 23, 2008, SSJC commenced an adversary proceeding in this Court seeking to enjoin the foreclosure sale ("October 2008 Action").

38. SSJC likely moved to enjoin the foreclosure sale because it knew that the foreclosure would extinguish the Intermediate Agreement. Its counsel described its motives during the hearing before Your Honor:

> In addition, there's a question as to whether our client, [SSJC], would be able to continue to exist or whether Madison would take steps to try and extinguish the [Intermediate Agreement]. Now, I think that there are arguments why that's not possible. **But to the extent they were successful in extinguishing the [Intermediate Agreement], [SSJC] would cease to exist**.

*See* Transcript (Exhibit "I") at p. 16 (emphasis added).

39. In its accompanying motion for an immediate stay of the foreclosure sale, SSJC asserted that it would suffer irreparable harm if the foreclosure sale proceeded. *See* motion dated October 22, 2008, at paragraph 2, a copy of which (without exhibits) is attached

8

as Exhibit "J"; *see also* Declaration of Michael T. Conway dated October 22, 2008, at paragraph 2, a copy of which is attached as Exhibit "K".

40. SSJC was not the owner of the Shopping Center. Its sole interest related to the preservation of the Intermediate Agreement.

41. This Court did not issue any injunction to stop the foreclosure.

42. On October 24, 2008, Madison foreclosed on the Shopping Center and immediately assigned its bid to 67500.

43. On or about January 13, 2009, after SSJC's attempts to block the foreclosure failed, the parties filed a stipulation of dismissal of the October 2008 Action, a copy of which is attached as Exhibit "L".

44. The Shopping Center was not redeemed by RRLP or any other party within the redemption period allowed by Michigan law. Because the DIP Mortgage was senior to all other liens, encumbrances and interests, the foreclosure of the DIP Mortgage extinguished the subordinate Intermediate Agreement. *See*, *e.g.*, *In re Parlovecchio*, 315 B.R. 694, 695 (Bankr.E.D.Mich. 2004) (holding that under Michigan law, when the redemption period expires after a foreclosure sale, "a sheriff's deed ripens into legal title and cuts off all junior interests in the property that were not consented to by the mortgagee") (citing M.C.L.A. § 600.3236).

45. 67500 is now the fee simple owner of the Shopping Center free of all liens, encumbrances and interests.

**SSJC's Misconduct and the State Court Proceeding**

46. After the redemption period expired, 67500 began contacting tenants at the Shopping Center and directing them to pay rents to 67500 in accordance with its rights.

47. SSJC interfered with 67500's rights to collect the rents at the Shopping Center. Apparently, SSJC thinks that the Intermediate Agreement is still extant, and was actually senior to the DIP Mortgage (despite the language of the DIP Order, which granted Madison a superpriority priming lien).

48. In an attempt to avoid the jurisdiction of this Court -- which had already entered the DIP Order and denied SSJC's prior efforts to block the foreclosure – SSJC purported to commence an arbitration proceeding before JAMS (the "Arbitration Proceeding"). A copy of SSJC's Demand for Arbitration Before JAMS (the "Arbitration Demand") is attached as Exhibit "M". The Arbitration Demand invoked an arbitration clause in the Intermediate Agreement.

49. In addition, SSJC commenced a proceeding in the New York County Supreme Court to obtain injunctive relief in aid of the purported arbitration (the "State Court Proceeding"). The documents that SSJC filed in the State Court Proceeding are attached collectively as Exhibit "N".

50. In the State Court Proceeding, SSJC alleges, among other things, that it has the right to collect rents from tenants at the Shopping Center despite: (i) SSJC's express waiver of such claims in the September 2008 Agreement; (ii) the provision of the DIP Order granting Madison priming liens on all of RRLP's assets, which liens were senior to all liens, claims, encumbrances and interests, including those held by SSJC; and (iii) the extinguishment of any subordinate rights SSJC had upon the foreclosure of the DIP Mortgage.

51. On or about May 12, 2009, the state court issued the temporary restraining order (the "State Court TRO") that plaintiffs seek to vacate and/or modify herein. *See* Exhibit "N".

52. Since this Court has exclusive jurisdiction over this matter, plaintiffs timely removed the State Court Proceeding on June 10, 2009. A copy of the Notice of Removal (without exhibits) is attached as Exhibit "O".

### Plaintiffs' Adversary Proceeding

53. On June 3, 2009, plaintiffs also commenced the within adversary action against SSJC in its bankruptcy case. A copy of the adversary complaint (without exhibits) is attached as Exhibit "P".

54. In the adversary complaint, plaintiffs have brought causes of action for: (i) a declaratory judgment declaring that plaintiffs are not bound by the arbitration clause in the Intermediate Agreement; (ii) a declaratory judgment declaring that Madison's liens were superior to the liens, claims, encumbrances, and interests of SSJC, including SSJC's interests under the Intermediate Agreement; (iii) a declaratory judgment declaring that the foreclosure by Madison of its priming lien has foreclosed and extinguished any liens, interests and encumbrances of SSJC in the Shopping Center including, without limitation, the Intermediate Agreement, as such liens, interests and encumbrances of SSJC were subordinate to Madison's priming lien; (iv) a declaratory judgment declaring that the Intermediate Agreement is not a lease but is a disguised financing transaction calculated to provide tax attributes to the parties thereto and, therefore, SSJC is not entitled to the protections of section 365(h) of the Bankruptcy Code; (v) a declaratory judgment declaring that SSJC waived any rights it had to collect rents at the Shopping Center; and (vi) a declaratory

judgment staying and/or dismissing the Arbitration Proceeding, and declaring that this Court has exclusive jurisdiction over this dispute.

## ARGUMENT

## POINT I

## THE JAMS ARBITRATION SHOULD BE STAYED

55. SSJC tried to avoid this Court's exclusive jurisdiction by commencing the Arbitration Proceeding before JAMS.

56. Respectfully, that arbitration should be stayed pending further Order of this Court. *See Starkman v. Seroussi*, 377 F. Supp. 518, 524 (S.D.N.Y. 1974) (granting motion to stay arbitration where issues to be arbitrated fell within the exclusive jurisdiction of the federal courts).

## POINT II

## THE STATE COURT TRO EXPIRED 10 DAYS AFTER REMOVAL

57. "[O]nce a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 437 (1974).

58. Temporary restraining orders are governed by Rule 65(b) of the Federal Rules of Civil Procedure. Rule 65(b)(2) states that a temporary restraining order issued without notice "expires at the time after entry . . . **not to exceed 10 days**. . . that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record." (emphasis added).

59. Thus, by law, the State Court TRO dissolves automatically 10 days after the removal of this matter. *See*, *e.g.*, *Granny Goose*, 415 U.S. at 439-440 (holding that "in no event does [a temporary restraining order issued in state court] remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal"); *Carrabus v. Schneider*, 111 F. Supp.2d 204, 210 (E.D.N.Y. 2000) (holding that even a state court TRO granted **on notice** is subject to the time limitations imposed by Rule 65(b)).

60. Plaintiffs' notice of removal was filed on June 10, 2009. Therefore, the State Court TRO expired by law on June 20, 2009.

## POINT III

### TO THE EXTENT THAT THE STATE COURT TRO IS STILL EFFECTIVE, IT SHOULD BE VACATED AND/OR MODIFIED AND THIS COURT SHOULD <u>ISSUE AN INJUNCTION PROTECTING PLAINTIFFS' RIGHTS</u>

61. This Court has the power to vacate and/or modify a temporary restraining order issued by a state court prior to removal. 28 U.S.C. § 1450 ("All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect **until dissolved or modified by the district court.**") (emphasis added); *Granny Goose*, 415 U.S. at 437 (explaining that Section 1450 "recognize[es] the district court's authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal").

62. Even if the State Court TRO did not automatically expire, the Court should vacate and/or modify it for a number of reasons.

63. First, the State Court TRO violates this Court's DIP Order. This Court, and this Court alone, has the jurisdiction to hear and decide matters involving the DIP loan,

13

including Madison's priming lien. SSJC should not be allowed to go behind this Court's back and go forum shopping to obtain relief it suspects it could not get here.

64. Moreover, the State Court TRO is improperly preventing the owner of the Shopping Center (67500) from collecting the rents it is entitled to. As a DIP lender, Madison bargained for a superpriority claim and first priority lien, and this Court, in the DIP Order, granted Madison such a priming lien. SSJC agreed. Later, in the September 2008 Agreement, SSJC released all claims against Madison, including all claims to the rents. The State Court TRO is contrary to both the DIP Order and the September 2008 Agreement.

65. Further, the State Court TRO is jeopardizing 67500's interest in the Shopping Center. SSJC is not paying the real estate taxes. SSJC's conduct is exposing the property to tax liens and possibly a tax foreclosure. Tenants are withholding rents. This situation is simply untenable.

66. For these reasons, we respectfully request that the Court vacate the State Court TRO and enjoin SSJC from interfering with 67500's rights as owner of the Shopping Center, including the right to collect the rents at the Shopping Center.

67. Such injunctive relief is warranted where, as here, the moving party demonstrates "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Barturen v. Wild Edibles, Inc.*, No. 07 Civ. 8127, 2007 WL 4468656, at *3 (S.D.N.Y. Dec. 18, 2007) (quoting *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997)). All of these elements are satisfied here.

68. There is no question that plaintiffs have established a threat of irreparable harm if injunctive relief is not granted. SSJC is interfering with plaintiffs' rights and property interests in the Shopping Center and will continue to do so in the absence of injunctive relief, as set forth above. Courts have repeatedly held that the "deprivation of an interest in real property constitutes irreparable harm." *Third Church of Christ v. City of N.Y.*, No. 07 Civ. 10962, 2008 WL 5102466, at *13 (S.D.N.Y. Dec. 2, 2008) (citing *Tironda, LLC v. City of N.Y.*, 386 F. Supp.2d 342, 350 (S.D.N.Y. 2005)).

69. Plaintiffs have also clearly demonstrated a probability of success on the merits. As set forth above, the foreclosure proceeding extinguished the Intermediate Agreement, which was subordinate to the DIP Mortgage as expressly stated in this Court's DIP Order.

70. Moreover, the balance of hardships tips heavily in plaintiffs' favor. Without injunctive relief, plaintiffs will suffer irreparable harm, as set forth above. If injunctive relief is granted, plaintiffs will be protected. The only "harm" SSJC will suffer is not being allowed to interfere with plaintiffs' interests in the Shopping Center and collect rents to which it is not entitled. Respectfully, that is no harm at all.

71. In the alternative, even if the Court allows SSJC to continue collecting the rents, SSJC should be ordered to pay the Shopping Center's ordinary expenses (including taxes) in accordance with an approved budget, and distribute the remainder of the monies by: (i) paying the first $635,464.08 per year to 67500[2]; and (ii) placing any excess funds in escrow pending further order of the Court or agreement of the parties. SSJC can hardly

---

[2] This is the amount of the yearly "rent" under the Intermediate Agreement. *See* Intermediate Agreement at § 1.01. As noted above, it is our position that the Intermediate Agreement was extinguished by the foreclosure of the superpriority DIP Mortgage. However, even if the Court accepted that Intermediate Agreement is somehow still in place (which is denied), SSJC would owe, at a minimum, that yearly "rent" to 67500, the new owner of the Shopping Center.

argue against such relief. Indeed, SSJC claims that the Intermediate Agreement is still extant, so SSJC should have no quarrel with paying the monies owed under that very agreement.

72. The legal authorities for the relief sought herein are set forth in this motion. Accordingly, pursuant to Local Rule 9013-1, no separate memorandum of law is required.

**WHEREFORE**, plaintiffs respectfully request that the Court grant this motion in all respects and enter the accompanying Order.

Dated: June 19, 2009
      Mineola, New York

WESTERMAN BALL EDERER MILLER
  & SHARFSTEIN, LLP


/s/ *Jeffrey A. Miller, Esq.*
Jeffrey A. Miller, Esq. (JM 6352)
Eric G. Waxman III, Esq. (EW 0498)
170 Old Country Road, Suite 400
Mineola, New York 11501
(516) 622-9200
*Attorneys for Madison Realty Capital, L.P. and 67500 South Main Street, Richmond LLC*

204510-14

## VERIFICATION

I, Eric Scheffler, am the Managing Director and General Counsel of plaintiff Madison Realty Capital, L.P. Pursuant to 28 U.S.C. § 1746, I hereby declare that I have read the foregoing Plaintiffs' Motion to Stay Arbitration, Vacate A State Court Temporary Restraining Order, And For Injunctive Relief Consistent With This Court's DIP Order Pending A Determination Of The Underlying Adversary Proceeding, and I declare that the factual allegations contained therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 19, 2009
New York, New York

ERIC SCHEFFLER