# EXHIBIT D

LeCLAIR RYAN, a Professional Corporation
Michael T. Conway, Esq.
830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation
 and First Richborough Realty Corporation

Duffy & Amedeo LLP
Todd E. Duffy, Esq.
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972

Attorneys for Richmond Realty Limited Partnership

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| SCARBOROUGH-ST. JAMES CORPORATION, et al., | Case No. 03-17966 (JMP) |
| Debtors. | (Jointly Administered) |

---

**NOTICE OF DEBTORS' JOINT MOTION FOR AN ORDER AUTHORIZING
DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS,
GRANT SECURITY INTERESTS AND SUPER PRIORITY CLAIMS
AND PROVIDE ADEQUATE PROTECTION PURSUANT TO
SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE AND
RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

PLEASE TAKE NOTICE that on February 21, 2007, at 10:00 a.m, Scarborough-St James Corporation ("SSJC"), First Richborough Realty Corporation ("FRRC") and Richmond Realty Limited Partnership ("RRLP"), collectively, the debtors and debtors-in-possession in these Chapter 11 cases (the "Debtors"), will bring their Motion (the "Motion"), before the Honorable James M. Peck, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004-1408, for an Order authorizing debtor to incur post petition secured indebtedness, grant security interests and super priority claims pursuant to Sections 361, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must be in writing and served upon (i) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004 (Attention: Paul K. Schwartzberg, Esq.); (ii) counsel for the SSJC and FRRC Debtors, LeClair Ryan, P.C., 830 Third Avenue, New York, New York 10022 (Attention: Michael T. Conway, Esq.); (iii) counsel for the RRLP Debtors, Duffy & Amedeo LLP, Seven Penn Plaza, Suite 420, New York, New York 10001 (Attention: Todd E. Duffy, Esq.); and (iv) filed with the Bankruptcy Court, with a copy to Judge Peck's Chambers, so as to be received no later than 5:00 p.m. on February 16, 2007 (EST).

Dated: January 25, 2007
      New York, New York

LeCLAIR RYAN, a Professional Corporation


By: /s/ Michael T. Conway
Michael T. Conway (MC2224)
830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation
  and First Richborough Realty Corporation

       -and-

DUFFY & AMEDEO LLP


By: /s/ Todd E. Duffy
Todd E. Duffy
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972

Attorneys for Richmond Realty Limited Partnership

LeCLAIR RYAN, a Professional Corporation
Michael T. Conway, Esq.
830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation
  and First Richborough Realty Corporation

Duffy & Amedeo LLP
Todd E. Duffy, Esq.
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972

Attorneys for Richmond Realty Limited Partnership

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| SCARBOROUGH-ST. JAMES CORPORATION, et al., | Case No. 03-17966 (JMP) |
| Debtors. | (Jointly Administered) |

---

**DEBTORS' JOINT MOTION FOR AN ORDER AUTHORIZING
DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS,
GRANT SECURITY INTERESTS AND SUPER PRIORITY CLAIMS
AND PROVIDE ADEQUATE PROTECTION PURSUANT TO
SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE AND
RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Scarborough-St James Corporation ("SSJC"), First Richborough Realty Corporation

("FRRC") and Richmond Realty Limited Partnership ("RRLP") as debtors and debtors in

possession, by counsel, hereby move the Court for the entry of an order authorizing the Debtors to incur postpetition debt.

## JURISDICTION AND VENUE

1.      On December 17, 2003 (the "Petition Date"), SSJC and FRRC commenced their cases (the "SSJC/FRRC Bankruptcies") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      On November 22, 2006 (the "RRLP Petition Date"), RRLP filed with this Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors' estates are being jointly administered for procedural purposes only.

4.      The Debtors continue to operate their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## The Debtor's Business

6.      RRLP was formed during the second quarter of 1985 by SSJC. Thereafter, SSJC and FRRC sponsored a private placement of the 40 ownership units of RRLP. The placement was underwritten by NASD member firms, during the second, third and fourth quarters of 1985, the proceeds of which were used by RRLP to acquire a shopping center (the "Shopping Center") in Richmond, Michigan. RRLP has two general partners, Thomas L. Armano, Jr. (the managing general partner) and Howard A. Ross, and 50 limited partners.

7.      RRLP acquired the Shopping Center on August 1, 1985 from FRRC. The Shopping Center, which RRLP continues to own, is approximately 158,000 square feet in size

and is situated on approximately 19.81 acres of land. The Shopping Center is anchored by Kmart (89,175 square feet), CVS and Radio Shack. The shopping center has one major vacancy in a location that was formerly occupied by Kroger supermarket and several small (satellite) store vacancies.

## Ownership and Financing History of the Shopping Center

8. As partial consideration for the sale of the Shopping Center to RRLP, FRRC, took back a long term, purchase-money wraparound mortgage from RRLP in the original principal amount of $7,830,000 (now approximately $8,608,889), which wrapped around and was inclusive of the all the underlying mortgages on the Shopping Center (the "FRRC Wrap").

9. Simultaneously with the sale of the Shopping Center by FRRC to RRLP, FRRC leased back the Shopping Center from RRLP and pursuant to said leaseback, RRLP assigned all of the revenues of the shopping center to FRRC and FRRC assumed the obligation to pay all of the Shopping Center's expenses (the "Intermediate Lease").

10. The interaction of the Intermediate Lease, FRRC Wrap and FRRC's rights and obligations thereunder gave FRRC a substantial income earning capacity and control of the Shopping Center until 2023.

11. FRRC sold the FRRC Wrap and Intermediate Lease and all of its rights associated therewith in 1985 to MCANY of Richmond Fund Limited Partnership, a New York limited partnership ("MCANY I").

12. Simultaneously with FRRC selling the FRRC Wrap and Intermediate Lease to MCANY I, FRRC entered into a long term servicing agreement (the "Servicing Agreement") with MCANY I, pursuant to which FRRC administered the Intermediate Lease and services the FRRC Wrap on behalf of MCANY I and RRLP.

13. The interaction of the Intermediate Lease, FRRC Wrap and Servicing Agreement preserved the substantial income earning capacity and control of the Shopping Center FRRC derived from its originally having entered into the Intermediate Lease and FRRC Wrap with RRLP.

14. MCANY I assigned the Intermediate Lease and the FRRC Wrap to MCANY of Richmond Fund Limited Partnership II, a New York limited partnership ("MCANY II") in approximately 1994.

15. RRLP, mistakenly believing MCANY II to be in default of the Intermediate Lease, transferred said lease from MCANY II in November, 2003.

16. By virtue of the erroneous transfer of the Intermediate Lease and, in turn, the Servicing Agreement, FRRC lost the substantial earning capacity and control of the Shopping Center to which it was entitled.

17. Based in part on this transfer of the Intermediate Lease, SSJC and FRRC filed the SSJC/FRRC Bankruptcies in December 2003.

18. Pursuant to the SSJC/FRRC Bankruptcies, SSJC and FRRC alleged, *inter alia*, that the Intermediate Lease had been improperly transferred and that said transfer represented a preferential transfer of an asset of SSJC/FRRC under the United States Code.

19. During the second quarter of 2004, with FRRC no longer in control of the Shopping Center, John M. Beeding, Jr. ("Beeding"), the managing partner of the Beeding Legal Group ("BLG"), a Mount Clemens, Michigan law firm, commenced negotiations with Peter Beer ("Beer"), and Robert Eisenhardt ("Eisenhardt"), two Michigan based entrepreneurs who had been involved with the Shopping Center in various capacities since it was built, to lend RRLP money.

20.     BLG, prior to entering into the negotiations with Beer and Eisenhardt, had recorded a lien and claim of interest on the Shopping Center, which purportedly secures a claim for legal fees (the "BLG Lien").

21.     In July, 2004, Beeding arranged a $2,000,000 loan to RRLP through Beer and Eisenhardt.

22.     The loan was entered into in full knowledge of the SSJC/FRRC Bankruptcies by all involved and the fact that, *inter alia*, the transfer of the Intermediate Lease and FRRC's loss of control of the Shopping Center, due to the transfer of said lease, were being challenged in the SSJC/FRRC Bankruptcies. Beer and Eisenhardt ignored the fact that assets of SSJC and FRRC, which were protected by their bankruptcies, would be compromised, if not diluted by the loan.

23.     If the Intermediate Lease had not been erroneously and preferentially transferred only months earlier, the loan could not have been made without the approval of FRRC.

24.     The loan unfolded as follows:

> (a) RRLP borrowed $2,000,000 from Carmen L.L.C., a Michigan limited liability company ("Carmen"), of which Beer, Eisenhardt and, upon information and belief, Benedetto Sorrentino, were principals, in July, 2004 for two years, payable on an interest only basis at 14% interest (the "Carmen Loan");
>
> (b) Carmen borrowed the $2MM it loaned to RRLP from Warren Bank for two years, payable on an interest only basis at 7% interest (the "Warren Loan");
>
> (c) Upon information and belief, the principals of Carmen put up substantial collateral to secure the $2MM Warren Loan to Carmen;
>
> (d) RRLP further secured the Warren Loan to Carmen by giving Warren Bank a first mortgage on the Shopping Center (the "Warren Mortgage"); and,
>
> (e) RRLP also gave Carmen a mortgage on the Shopping Center to secure the Carmen Loan to RRLP, which wrapped around and was inclusive of and subordinate to the Warren Mortgage (the "Carmen Mortgage").

25.     The fact that assets of SSJC and FRRC were protected by their bankruptcies, as well as the fact that SSJC's and FRRC's loss of control of the Shopping Center was being challenged in said bankruptcies was ignored by Warren Bank, Carmen and their respective counsel, despite their knowledge of the same.

26.     Almost simultaneously with, but slightly prior to the closing of the Warren Bank and Carmen Loans, Beeding suggested that RRLP and MCANY II amend the FRRC Wrap so that various modifications to the FRRC Wrap, which had been memorialized over the years via a series of unrecorded letter agreements, especially, but not limited to MCANY II's agreement to subordinate the FRRC Wrap to future financings of the Shopping Center that may be undertaken by RRLP, could be incorporated into one mortgage document, which would be recorded.

27.     Beeding's recommendation to amend and, in effect, "strengthen" the recorded version of the FRRC Wrap was initially of concern to RRLP and MCANY II, because in the loan term sheet Beeding negotiated with Carmen on behalf of RRLP, Carmen required that RRLP eliminate the FRRC Wrap.

28.     RRLP and MCANY II ultimately agreed to amend the FRRC Amended Wrap, as suggested by Beeding, after Beeding assured them that he could convince the Carmen principals to go through with the loan, despite the fact that the FRRC Wrap could not be eliminated.

29.     RRLP and MCANY II discovered in the summer of 2006 that by amending the FRRC Wrap, as suggested by Beeding, MCANY II had unwittingly subordinated the FRRC Wrap to the BLG Lien, which the parties to said subordination neither agreed to nor negotiated for. This has become a great source of contention between Beeding, RRLP, MCANY II, SSJC and FRRC and is the subject of certain malpractice claims currently pending against Beeding and BLG in an adversary proceeding filed by SSJC and FRRC against Beeding and BLG.

6

30.     BLG, pursuant to the Warren Loan and Carmen Loan, subordinated the BLG Lien to the Warren Mortgage, but not to the Carmen Mortgage, which, according to Beer, Beeding had agreed to do.

31.     MCANY II subordinated the FRRC Wrap to the Warren Mortgage.

32.     On or about June 26, 2006, RRLP, SSJC, FRRC, MCANY II and certain other parties settled their disputes under the SSJC/FRRC Bankruptcies, pursuant to a Stipulation Resolving Claims ("Stipulation") and, on August 9, 2006, the Bankruptcy Court approved said Stipulation.

33.     Pursuant to the Stipulation, the preferential transfer of the Intermediate Lease was deemed void *ab initio* and the Servicing Agreement was reinstated.

34.     In addition, MCANY II assigned a portion of the FRRC Wrap, in the amount of $1,400,000, to SSJC and FRRC ("Assigned Portion"), and it subordinated the balance of the FRRC Wrap to this Assigned Portion.

35.     Also pursuant to the Stipulation, MCANY II and RRLP each gave SSJC and FRRC a power of attorney to enter into financing arrangements, such as the one contemplated by this motion, on their behalf and MCANY II agreed to subordinate the FFRC Wrap to any such financing arrangements.

36.     The Warren Mortgage came due on or about July 16, 2006 and RRLP was unable to pay it off.

37.     Counsel for SSJC and FRRC attempted to negotiate a forbearance agreement with Warren Bank, to which, upon information and belief, the president of Warren Bank initially agreed, but ultimately reneged upon based on the request of Beer.

38.     Warren Bank commenced a foreclosure by advertisement based on an alleged failure to pay $2,016,658.17 by RRLP, which, in Michigan, upon information and belief, means that after five consecutive weeks of advertising the foreclosure in the appropriate legal newspaper, the mortgagee is free to auction the Shopping Center, with the mortgagor having six months to redeem. Upon information and belief, Warren has not sought compensation from the collateral the principals of Carmen, to whom Warren Bank made the Warren Loan, and has instead chosen to foreclose on RRLP's shopping center as its sole remedy.

39.     Prior to the RRLP Petition Date, RRLP, SSJC and FRRC attempted to obtain financing to satisfy the Warren Loan, which they should have been able to do given the value of the Shopping Center. However, the question as to priority of the BLG Lien deterred any lender from offering financing to RRLP.

40.     In any event, counsel to Warren Bank informed bankruptcy counsel to SSJC and FRRC that any attempts by SSJC, FRRC and/or RRLP to tender full payment of all moneys due under the Warren Loan would be refused and the auction would go forward.

41.     Further, sources at Warren Bank indicated that it was Beer, a long time client of Warren Bank and someone who has made frequent, unsuccessful overtures to RRLP about acquiring the Shopping Center, that is behind Warren Bank's refusal to be paid off and determination to foreclose on the Shopping Center.

42.     The notice of foreclosure and protection of RRLP's interest in the Shopping Center, were the primary factors that necessitated the filing of the RRLP's chapter 11 case. Indeed, without the protections afforded by bankruptcy, only one of RRLP's creditors, Warren Bank, would have a recovery from any sale of the Shopping Center and RRLP's other creditors would have received nothing.

43.     As set forth in Schedule 1 hereto, the existing creditors, other than the relevant taxing authorities, which claimed a security interest in the Shopping Center as of the RRLP Petition Date were: Warren Bank, Carmen, SSJC (and FRRC), BLG, C & R Maintenance, Inc., a Michigan corporation, d/b/a Rizzo Services ("C&R") and RG Eisenhardt Contracting Inc. ("RGE") (collectively, at times, the "Pre-petition Lien Holders").

## Relief Requested

44.     By this Motion, the Debtors request that this Court (i) enter the proposed order (the "Order") attached hereto as <u>Exhibit B</u> authorizing the Debtors to: (a) obtain secured credit in the form of a $3.1 million credit facility (the "Loan") pursuant to a certain January 11, 2007 Revised Loan Offer (the "Loan Agreement") attached hereto as <u>Exhibit A</u>, by and between RRLP, as borrower, and Madison Realty Company L.P. (the "Lender"), (b) grant to the Lender a superpriority lien (the "Superpriority Lien"); (c) accord the Lender's claims under the Loan superpriority administrative expense status; and (d) authorize RRLP to carry out the "adequate protection regime" set forth herein below.

## The Proposed Loan

45.     RRLP has accepted a loan offer from the Lender, subject to Court approval, under the following terms and conditions (the "Loan"):

- The Lender will lend RRLP $3,100,000.00.

- RRLP will provide security for the Loan in the form of (a) a super priority lien on the Shopping Center, and (b) a collateral assignment and security interest in all current and future leases, rents, and other income related to the Shopping Center.

- The Lender shall receive a super priority lien for all amounts advanced under the Loan.

- The term of the Loan shall be one year. If all payments are made on time with no prior material defaults, RRLP may extend the term for one additional year for a fee of one percent (1%).

- The Loan shall bear interest at twelve percent (12%) per annum.

- RRLP may not prepay the Loan unless and until the Lender has received six months' interest on the gross loan amount.

- RRLP shall pay a loan fee of three percent (3%) of the Loan amount at closing.

- A condition of funding shall be that Kmart pay its monthly rent directly to the Lender, from which the Lender shall deduct its monthly debt service and remit any balance to RRLP.

- RRLP shall pay a $5,000.00 interest reserve at closing.

- Thomas L. Armano, Jr., the managing general partner of RRLP, shall guaranty the Loan and grant to the Lender a security interest in and on one hundred percent (100%) of the economic rights and/or benefits associated with his general partnership interest in RRLP.

- Subject to Bankruptcy Court approval, the Lender shall receive a break-up fee equal to two percent (2%) of the Loan amount, payable only in the event of a failure to close due to the fault of RRLP (the "Break-up Fee").

46. The Loan will satisfy the Warren Loan and the Carmen Loan. The other secured lenders, SSJC, FRRC, and MCANY II, consent to the liens contemplated by the Loan.

## Legal Authority

**A.      Approval under Section 364(c)**

47.      Under Section 364(c), the statutory requirement for obtaining post-petition credit of this nature is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(c) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c); *see also* In re Ames Dept. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); In re Garland Corp., 6 B.R. 456, 461 (Bankr. 1st Cir. 1980) (secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

48.      Courts have articulated a three-part test to determine whether a debtor is entitled to Section 364(c) financing:

(a)      The debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(b)      The credit transaction is necessary to preserve the assets of the estate; and

(c)      The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, Inc., 115 B.R., *supra*, at 37-39; In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991). The Debtors will present evidence at the hearing that will satisfy all three elements of this test.

**B.** **The Debtor Had No Alternatives to the Loan**

49.     There is no prospect that the Debtors could obtain the necessary financing on an unsecured basis.   Indeed, under the circumstances, the only realistic source of debtor-in-possession financing is the Loan.  Each of the counsel for the Debtors and the Managing General Partner of RRLP have met with lenders from around the Country and, in each case, they were told that an unsecured loan was out of the question and that, in fact, a loan which was not granted super priority status Section 364(c) of the Bankruptcy Code was not an option.

50.     The Loan at issue is offered on terms that were substantially better than all but one other proposed loan, and that other proposed loan was essentially on the same terms as the Loan, but would have required a pre-loan cash outlay by the Debtors not required in the Loan.

51.     In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Federal Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c).  Id. at 1088; *see also* In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).    Thus, the evidence at the hearing on the present motion will satisfy the requirement of Section 364(c) that unsecured credit be unavailable to RRLP.

**C.** **The Loan is Necessary to Preserve Assets of the Debtors' Estates**

52.     Without the funding contemplated by the Loan, the Debtors will exhaust their available cash and will not be able to pay off the Warren Loan (which would pay off the Warren and Carmen mortgages).   The Debtors would not be able to continue operations, and, as a consequence, the Debtors' chapter 11 cases would likely be converted to cases under chapter 7 for liquidation, with Warren Bank being the only creditor to receive any recovery.  Therefore, the

Loan is critically necessary to preserve the going concern value of the Debtors' assets and protect the value of the estates.

## D. The Terms of the Loan are Fair, Reasonable, and Appropriate

53.     The proposed terms of the Loan are fair, reasonable, and adequate in that these terms neither (a) prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors nor (b) prevent motions by parties in interest from being decided on their merits.  The purpose of the Loan is to enable the Debtors to maintain the value of their estates while formulating a confirmable plan of reorganization.  In re First South Sav. Ass'n, 820 F.2d 700, 710-15 (5th Cir. 1987).

54.     Likewise, the various fees and charges required by the Lender under the Loan are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364.  See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

55.     The fairness and reasonableness of the terms of the Loan will be shown at the hearing on the Motion.

## E. Application of the Business Judgment Standard

56.     The Debtors' management has concluded that the Loan is the best alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D.

Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

57.    In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

58.    The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow pursuant to the Loan. The terms of the Loan are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, RRLP should be granted authority to enter into the Loan and borrow funds from the Lender on the secured, administrative "super priority" basis described above, pursuant to Section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the Loan and as requested herein.

F.    **Good Faith**

59.    The terms and conditions of the Loan are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Therefore, the Lender should be accorded the benefits of section of 364(e) of the Bankruptcy Code to the extent any or all of the provisions of

the Loan and related documents, or any interim or final order of this Court pertaining thereto, are

hereafter modified, vacated, stayed, or terminated by subsequent order of this or any other court.

**G.  Incurrence of Superpriority Secured Debt**
    **Pursuant to Sections 364(c) and (d) of the Bankruptcy Code**

60.     Section 364 of the Bankruptcy Code provides in pertinent part as follows:

> (a)   . . . unless the Court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under § 503(b)(1) of this title as an administrative expense.
>
> (b)  The Court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under § 503(b)(1) of this title as an administrative expense.
>
> (c)  If the trustee is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the Court, after notice and a hearing may authorize the obtaining of credit or the incurring of debt –
>
> > (1)  with priority over any or all administrative expenses of the kind specified in § § 503(b) or 507(b) of this title;
> >
> > (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §§ 364(a) through (c).

61.     In addition, section 364(d)(1), which governs the incurrence of post-petition debt

secured by senior or "priming" liens, provides that, the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> > (A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

62.     Thus, Section 364 is structured with "an escalating series of inducements which a debtor may use to attract credit in the post-petition period." Mulligan v. Sobiech, 131 B.R. 917, 921 (S.D.N.Y. 1991). The debtor must demonstrate that it cannot obtain necessary financing without resort to § 364(c) or (d) of the Bankruptcy Code in order for the Court to approve financing thereunder. In re Caldor, Inc., 240 B.R. 180, 189 (Bankr. S.D.N.Y. 1999).

63.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super priority administrative expense status or is secured by a lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. 11 U.S.C. § 364(d).

64.     It is impossible for the Debtor to obtain postpetition financing on an unsecured basis pursuant to Sections 364(a), (b) or (c) of the Bankruptcy Code. The circumstances of this case require the Debtor to obtain its financing under Bankruptcy Code Section 364(d). Accordingly, this Court should authorize the Debtor to obtain the Loan pursuant to the terms contained in the accompanying Interim Order.

65.     Pursuant to §552(a) of the Bankruptcy Code, "except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the

debtor before the commencement of the case." "This subsection was 'designed to facilitate the debtor's 'fresh start' by allowing the debtor to acquire post-petition assets free of prepetition liabilities' and thereby offer 'postpetition accounts receivable and inventory as collateral' to new creditors." Unsecured Creditors Committee v. Marepcon Financial Corporation (In re Bumper Sales, Inc.), 907 F.2d 1430, 1436 (4th Cir. 1990); In re Photo Promotion Associates, Inc., 53 B.R. 759, 763 (Bankr. S.D.N.Y. 1985).

**H.    Adequate Protection**

66.    Pursuant to section 364(d)(1)(B) of the Bankruptcy Code, the Debtors' granting of the Priming Liens requires that there be adequate protection of the interests of the holder of the lien on the property of the estate on which the Priming Liens are proposed to be granted. 11 U.S.C. § 364(d)(1)(B).

67.    The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under sections 362, 363 or 364 of the Bankruptcy Code:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the…use…under section 363 of this title, or any grant of a lien under section 364 of this title…results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such…use…or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief…as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

68.	Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361, 363, and 364. However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." *See* 11 U.S.C. § 361. Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). *See also* In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

69.	Thus, under applicable case law, the Pre-petition Lenders are entitled to "adequate protection" against diminution in the value of their collective interest in the Debtors' property by reason of the use of Cash Collateral and granting of the Priming Liens. Where the value of the Pre-petition Lenders' collateral is not diminishing by its use or by the granting of liens, the Pre-petition Lenders' interests are adequately protected. *See, e.g.*, United Saving Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372, 108 S. Ct. 626, 630 (1988); In re Forest Ridge, II, Ltd. Partnership, 116 B.R. 937 (Bankr. W.D.N.C. 1990); McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Properties VI., Ltd.), 88 B.R. 261 (Bankr. C.D. Cal. 1988); Robert Neier v. Clark Oil & Ref. Corp. (In re Apex Oil Company), 85 B.R. 538 (Bankr. E.D. Mo. 1988); Bankers Life Ins. Co. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.), 12 B.R. 803, 807-808 (Bankr. D. Utah 1981).

70.    In the instant case, RRLP has structured an adequate protection regime to protect the Pre-petition Lenders for any diminution in the value of their interests that occurs as a result of the Priming Liens as follows (in order of priority):

a.    Property Taxes.    The proposed DIP financing will be used, in part, to satisfy any and all tax obligations accruing to the Shopping Center, currently estimated at approximately $200,000, upon obtaining an Order from this Court authorizing such payment. RRLP proposes to place a portion of the DIP financing proceeds, $200,000, into an escrow account controlled by its counsel for this purpose and will pay this amount to the Macomb County Michigan Treasurer's Office and the Office of the City Treasurer for the City of Richmond, Michigan, in full and final satisfaction of any tax obligations which existed as of the RRLP Petition Date.  In the meantime, RRLP proposes that a replacement lien, in an amount to be determined, on this account shall serve as adequate protection to the relevant taxing authorities.

b.    Warren Bank Lien/Carmen Lien.    The proposed DIP financing will be used, in part, to satisfy the Warren Bank Lien and, as a matter of course, the related Carmen Lien which wraps around and is inclusive of the Warren Bank Lien.  RRLP proposes to place a portion of the DIP financing proceeds, $2,016,658.17, the amount set forth in the foreclosure notice of Warren Bank as of the RRLP Petition Date, into an escrow account controlled by its counsel for this purpose and will pay this amount to Warren Bank in full and final satisfaction of the Warren Bank and Carmen Liens upon obtaining an Order from this Court authorizing such payment.  In the meantime, RRLP proposes that a replacement lien on this account shall serve as adequate protection to Warren Bank and Carmen.  RRLP further requests that this Court issue an Order

confirming that any payment to Warren Bank by RRLP shall have the effect of reducing, on a dollar for dollar basis, any liability owed by RRLP under both the Warren Bank Lien and the Carmen Lien and, upon full payment of the Warren Bank Lien, all security documents executed by RRLP in favor of either Warren Bank or Carmen in connection with the Warren Bank Liens shall be cancelled and deemed null and void. RRLP further requests that this Court's Order confirm that, immediately upon the funding of this account, any security interest of Warren Bank or Carmen in the leases, rents or profits from the Shopping Center shall cease and such rents and profits shall thereafter be paid pursuant to the Intermediate Lease and Servicing Agreement, as set forth in this Court's August 9, 2006 Order approving that certain June 26, 2006 Stipulation Resolving Claims, except with respect to the rents paid by Kmart, which shall be paid in accordance with the DIP Loan Agreement.

c. SSJC Lien. The proposed DIP financing will be used, in part, to partially satisfy the SSJC Lien. RRLP proposes to pay $450,000.00 to SSJC in partial satisfaction of the SSJC Lien and requests that the Order granting the Motion include authority to make such payment. Based on this payment, and based on the continued effect of the SSJC Lien on the Shopping Center as primed, SSJC consents to the proposed priming lien.

d. MCANY II Lien. MCANY II is only partially secured in this matter given the estimated value of the Shopping Center of $7,700,000. In other words, after payment of taxes, the Warren Bank Lien/Carmen Lien and the SSJC Lien, which liens total an estimated $3,613,000, there remains only (approximately) $4,283,341.83 in equity to secure the MCANY II Lien (which was in the amount of $7,208,890 as of the RRLP

Petition Date. As discussed above, MCANY II has given a power of attorney to SSJC whereby it has authorized SSJC to, *inter alia*, consent to the proposed priming lien. On behalf of MCANY II, and based on the continued effect of the MCANY II Lien on the Shopping Center as primed, SSJC consents to the proposed priming lien.

    e. <u>BLG Lien</u>. Given the value of the Shopping Center, the proposed priming lien will have no effect on the collateral interests of BLG and, accordingly, BLG is not entitled to adequate protection.

    f. <u>C&R Lien</u>. Given the value of the Shopping Center, the proposed priming lien will have no effect on the collateral interests of C&R and, accordingly, C&R is not entitled to adequate protection.

    g. <u>RGE Lien</u>. Given the value of the Shopping Center, the proposed priming lien will have no effect on the collateral interests of RGE and, accordingly, RGE is not entitled to adequate protection.

71.    In sum, subject to the provision of the forms of adequate protection described above and set forth in the DIP Loan Agreement and the Proposed Order, the Debtors believe that the interests of the Pre-petition Lien Holders are adequately protected.

<b><u>Waiver Of Memorandum Of Law</u></b>

72.    Because this Motion does not present any novel issues of law and the case law, statutory provisions and rules upon which the Debtors rely are set forth herein, the Debtors request that the Court waive and dispense with the requirement set forth in Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be filed in support of this Motion. The Debtors reserve the right, however, to submit a reply memorandum of law in the event objections to the Motion are filed.

## No Prior Request

73.     No prior request for the relief sought herein has been made to this or any other Court.

## Notice

74.     No trustee, examiner, or official creditors' committee has been appointed in the Debtors' cases. Notice of this motion has been given to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) each of RRLP's secured creditors; and (iii) RRLP's twenty (20) largest unsecured creditors. The Debtors submit that no other or further notice is necessary.

**WHEREFORE,** the Debtors request entry of an Order, substantially in the form submitted herewith as Exhibit B, and granting such other and further relief as the Court may deem proper.

Dated: January 25, 2007
      New York, New York

LeCLAIR RYAN, a Professional Corporation

By: /s/ Michael T. Conway
Michael T. Conway (MC2224)

830 Third Avenue, 5th Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Scarborough-St James Corporation
  and First Richborough Realty Corporation

-and-

DUFFY & AMEDEO LLP

By: /s/ Todd E. Duffy
Todd E. Duffy
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972

Attorneys for Richmond Realty Limited Partnership

## Schedule 1 - Liens

The "Warren Bank Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of Warren Bank, a Michigan banking corporation ("Warren Bank"), including, without limitation, that certain mortgage from Richmond Realty Limited Partnership, a Michigan limited partnership ("RRLP") to Warren Bank, filed of record August 6, 2004 in Liber 15738, page 667, in the original principal amount of $2,000,000.00, and the terms and conditions thereof, and that certain Assignment of Leases and Rents by RRLP to Warren Bank, dated as of July 16, 2004 and recorded in Liber 15738, page 683 on August 6, 2004.

The "Carmen Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of Carmen, L.L.C. ("Carmen"), including, without limitation, that certain Commercial Wrap Mortgage from RRLP to Carmen, filed of record August 6, 2004 in Liber 15738, page 689, in the original principal amount of $2,000,000.00, and the terms and conditions thereof.

The "MCANY II Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of MCANY of Richmond Fund II Limited Partnership, a New York limited partnership ("MCANY II"), including, without limitation, that certain mortgage from RRLP to First Richborough Realty Corporation, a Delaware corporation ("FRRC"), filed of record December 20, 1985 in Liber 3874, page 738, in the original principal amount of $8,140,000.00, and the terms and conditions thereof, which mortgage has been assigned to MCANY of Richmond Fund Limited Partnership, a Michigan limited partnership ("MCANY I") by Assignment recorded August 6, 2004 in Liber 15738, page 712 and further assigned to MCANY II by Assignment recorded August 6, 2004 in Liber 15738, page 833 which was amended and restated by Amended/Restated Wraparound Mortgage in the face amount of $9,022,835.00 executed by RRLP to MCANY II, dated July 27, 2004 and recorded August 6, 2004 in Liber 15738, page 857.

The "SSJC Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of Scarborough-St. James Corporation, a Delaware corporation ("SSJC") or FRRC, including, without limitation, that certain $1,400,000.00 portion of the MCANY II Lien which was assigned to SSJC and FRRC by MCANY II as part of a certain settlement dated as of June 26, 2006 and approved by the Bankruptcy Court by Order dated August 9, 2006, which assignment was recorded by way of a Memorandum of Assignment dated as of June 26, 2006 and filed on record September 27, 2006 in Liber 18186, page 759. The MCANY II lien was subordinated to the SSJC Lien by this same document such that the first $1,400,000 recovered under the MCANY II Lien, plus interest thereon from June 26, 2006, shall be paid to SSJC and/or FRRC prior to the payment of the balance of the MCANY II Lien to MCANY II.

The "BLG Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of the Beeding Legal Group, P.C., a Michigan professional corporation ("BLG"), including, without limitation, that certain interest of BLG, as set forth in an instrument recorded on August 20, 2003 in Liber 14072, page 671 and in an instrument recorded on March 30, 2004 in Liber 15204, page 1, in the stated amount of $125,000.

The "C&R Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of C & R Maintenance, Inc., a Michigan corporation, d/b/a Rizzo Services ("C&R"), including, without limitation, that certain Claim of Lien in favor of C&R in the original stated principal amount of $89,455.44, dated July 7, 2005, recorded July 8, 2005 in Liber 16884, page 94.

The "RGE Lien" shall mean and refer to any and all liens or encumbrances on the Shopping Center in favor of RG Eisenhardt Contracting Inc. ("RGE"), including, without limitation, that certain Claim of Lien in favor of RGE in the original stated principal amount of $119,971.98, recorded February 13, 2006 in Liber 17594, page 53.

# EXHIBIT A – LOAN AGREEMENT
## [See Attached]



# MADISON REALTY CAPITAL

261 Madison Avenue 18th floor New York, NY 10016 ● T:888-261-6234 ● F:646-219-5643 ● www.madisonrealtycapital.com

## Revised Loan Offer

January 11, 2007

Richmond Realty Limited Partnership
c/o Michael T. Conway, Esq
Leclair Ryan
830 Third Avenue, 5th Floor
New York, New York 10022

Dear Mr. Conway,

Attached, please find the Final Loan Offer on behalf of Madison Realty Capital ("MRC"). **This Loan Offer shall supersede all other documents and shall expire Forty Eight hours after the date of issuance.**

| | |
|---|---|
| **Borrower:** | Richmond Realty Limited Partnership a Michigan limited partnership ("RRLP") |
| **Lender:** | Madison Realty Capital |
| **Property(s)** | Kmart Shopping Center<br>67300-67500 Main Street<br>Richmond, MI 48062 |
| **Loan Amount:** | $3,100,000.00 |
| **Security:** | A court ordered, super priority lien on a 158,900 square feet shopping center located on 19.81 acres of land, anchored by Kmart (89,175 sq. ft.), with satellite stores such as CVS and Radio Shack, located in Richmond, Macomb County, Michigan.<br><br>In addition, a collateral assignment of, and security interest in, all current and future leases, rents and other income related to the Property must be provided. The mortgage and security interest shall constitute valid first liens, subject to no other liens or encumbrances.<br><br>Note: Kmart's lease is scheduled to expire on or about December 1, 2006, but Kmart has provided RRLP with notice of exercise of its first option to renew the lease for five years, such notice of exercise to be delivered to MRC. |

**Super Priority Lien:**  RRLP filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Bankruptcy Code on November 22, 2006. Loan will be contingent on obtaining super priority lien for MRC.

**Pledge of G.P.**  Thomas L. Armano, Jr., the general partner of RRLP, shall grant to MRC a security interest in and to one hundred percent (100%) of the economic rights and/or benefits associated with his general partnership interest in RRLP.

**Loan Term:**  1 year

**Option to Extend:**  If all payments are made on time with no prior material defaults, borrower may extend the term of the loan for an additional one (1) year. A one percent (1%) fee will be charged at execution of the extension.

**Interest Rate:**  The Loan shall bear interest at the annual rate equal Twelve Percent (12.0%) per annum.

**Amortization:**  Interest only

**Prepayment:**  No prepayment of the loan shall be permitted without the Lender, or its assigns, having received 6 months' interest on the gross loan amount, after which prepayment may occur without penalty.

**Loan Fee:**  Borrower shall pay a fee of Three Percent (3%) of the loan amount to MRC at closing

**Kmart Lockbox:**  A condition of funding shall be the direct payment by Kmart of its monthly rent ($30,617.33), to MRC, from which MRC shall deduct its monthly debt service and remit any balance of the Kmart rent, if any, to RRLP or its designee

**Interest Reserve:**  $5,000.00 to be collected at closing.

**Lease Approval:**  The Lender shall have the right to approve new leases and amendments to existing leases, but may not unreasonably withhold such consent. Failure to respond to submission of a proposed new lease or amendment within fifteen (15) days of receipt of a fully-executed copy of same shall constitute approval of the same. Lender agrees that any tenant currently occupying the shopping center on a holdover basis may be signed to a new lease on the same or better economic terms as its most recent written lease, without pre-approval of the Lender.

**Insurance:**  The Borrower shall maintain at all times, at the Borrower's sole cost and expense, policies of liability and property (including business income coverage) insurance, and other insurance coverage required by the Lender according to the loan documents. All insurance policies must be paid for the term of the loan at closing. Madison Realty Capital, its successors and/or assigns must be listed as mortgagee, loss payee, and additional insured. All insurance policies shall be issued by insurance companies satisfactory to MRC having an A.M. Best Key Rating of at least A/IX.

| | |
|---|---|
| **Survey and Title Insurance:** | The Borrower must provide the Lender with a current ALTA/ACSM "as-built" survey of the Property certified to the Lender, the title insurer and all other parties designated by the Lender, the cost of which shall be paid from the loan proceeds at closing. The Borrower shall purchase a lender's title insurance policy for the Lender in the amount of the loan, containing such endorsements as MRC may require. The title insurance must be provided by a nationally recognized company. |
| **Guaranty:** | The loan shall be guaranteed by Thomas L. Armano, Jr. Additionally, the Guarantor shall be required to execute an environmental indemnity and governmental compliance agreement. MRC arees to enforce any rights first against the property which secures MRC's lien before commencing an enforcement action against the Guarantor. So long as Borrower, Guarantor and/or any party related to Borrower and Guarantor do not raise or interpose any defenses or counterclaims whatsoever or object in any way to such foreclosure action, then Guarantor shall be relieved from all personal liability. |
| **Break-up Fee:** | MRC will be entitled to receive payment, subject to Bankruptcy Court approval, of a break-up fee equal to 2.00% of the Loan Amount which break up fee shall constitute liquidated damages. This break-up fee shall not be enforceable unless the loan does not close due to the fault of Borrower. Once the loan has closed, this break-up fee is no longer enforceable |
| **Closing:** | **TIME BEING OF THE ESSENCE.** |

This Loan Offer is subject to, and conditioned upon, completion of all due diligence and execution of legal documentation to the satisfaction of the Lender and its counsel, including review and approval of all Property-related documents including, without limitation, title reports, insurance policies and/or certificates, surveys, engineering and property condition reports, environmental reports, operating statements and tenant and lease information. If, prior to the proposed disbursement of the Loan, any fact or circumstance concerning or affecting the Property, the project, the Borrower, or any Guarantor varies materially from information previously submitted to or received by us, we shall have the right to refuse to consummate the Loan.

**Please acknowledge your acceptance of the terms and conditions described herein by faxing MRC an executed copy of this letter.**

**Signatures transmitted by facsimile or emailed pdf shall have the same force and effect as manually-signed signatures.**

Sincerely,

Madison Realty Capital

By: _____

Michael Bahiri
President

Accepted and Agreed:

Richmond Realty Limited Partnership

By: _____
Name: Thomas L. Armano, Jr.
Title: General Partner

Accepted and Agreed:

Individually and as Guarantor

By: _____
Thomas L. Armano, Jr.

## EXHIBIT B – PROPOSED ORDER
### [See Attached]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

Chapter 11

In re:

SCARBOROUGH-ST. JAMES CORPORATION, et al.,   Case No. 03-17966 (JMP)

Debtors.   (Jointly Administered)

---

## ORDER ON DEBTORS' JOINT MOTION FOR AN ORDER AUTHORIZING DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, GRANT SECURITY INTERESTS AND SUPER PRIORITY CLAIMS AND PROVIDE ADEQUATE PROTECTION PURSUANT TO SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Upon the annexed joint motion (the "Motion")[1] of Scarborough-St James Corporation ("SSJC"), First Richborough Realty Corporation ("FRRC") and Richmond Realty Limited Partnership ("RRLP"), collectively, the debtors and debtors-in-possession in these Chapter 11 cases (the "Debtors"), for entry of an order authorizing RRLP (i) to incur post-petition secured indebtedness pursuant to a credit agreement (the "DIP Loan Agreement")[2] dated January 11, 2007, by and between RRLP and Madison Realty Capital L.P. (the "Lender"), and (ii) to grant a security interest and a Superpriority claim pursuant to sections 105(a) and 364(c) and (d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having requested that:

---

[1] All terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement, as defined below, as applicable.

[2] The DIP Loan Agreement and the other agreements, instruments and other documents executed in connection therewith are collectively referred to herein as the "DIP Loan Documents."

(a) the Court authorize RRLP, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, to obtain from the Lender, advances up to an aggregate principal amount of $3,100,000 (the "DIP Loan"), with such advances to be made in accordance with the DIP Loan Agreement annexed to the Motion. RRLP will use the proceeds of the DIP Loan to finance its working capital and other general corporate purposes (including the repayment of approximately $2,000,000 to satisfy the Warren Bank and Carmen Liens and $450,000 to SSJC in partial satisfaction of the SSJC Lien), and to pay transaction costs in connection with the DIP Loan Documents;

(b) the Court issue an Order, pursuant to sections 364(c)(1), (2) and 364(d)(1) of the Bankruptcy Code, that the obligations of RRLP under the DIP Loan Agreement (the "DIP Obligations") (i) be granted Superpriority administrative expense status, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and (ii) be secured by perfected first priority security interests in and liens on all unencumbered pre-petition and post-petition property of RRLP excluding the Avoiding Power Causes of Action (the "Assets"), and (iii) be secured by perfected priming liens on all Assets, priming all existing secured creditors, including without limitation, Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, provided, however, that the claims and liens arising under clauses (i), (ii) and (iii) above are subject to the Carve-Out, as described below;

(c) the Court issue an Order approving the adequate protection regime structured by RRLP to protect the Pre-petition Lenders for any diminution in the value of their interests that occurs as a result of the granting of the Priming Liens as set forth in the Motion;

(d) the Court conduct a hearing to consider approval of the post-petition financing pursuant to the DIP Loan Agreement and authorizing RRLP to obtain advances thereunder in an aggregate principal amount of up to $3,100,000;

the Court finds, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Hearing given to (a) counsel for the Lender, (b) counsel to Warren Bank, (c) counsel to Carmen, (d) counsel for SSJC and FRRC; (e) counsel to BLG; (f) counsel to C&R; (g) counsel to RGE; (h) the twenty (20) largest unsecured creditors, (i) all known creditors who have a lien against RRLP's assets, (j) the Internal Revenue Service, (k) all state and local taxing authorities in the locations where RRLP conducts business, (l) the United States Attorney and (l) the United States Trustee (the "US Trustee") (collectively, the "Notice Parties") was good and sufficient under the particular circumstances and no other or further notice is or shall be required; and

based upon all of the pleadings filed with the Court, the evidence presented and the arguments of counsel made at the hearing on the Motion; and the Court having noted the appearances of all parties in-interest; and all objections to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court, and it appearing that the relief requested in the Motion is in the best interests of RRLP, its estate and its creditors, and such relief is essential for the operation of the Debtors' businesses; and it further appearing that RRLP is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or other secured financing on equal or more favorable terms than those set forth in the DIP Loan Documents; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED THAT:[3]**

1.      Disposition. The Motion is granted in its entirety on the terms of this Order. Any objections to the relief sought in the Motion that have not previously been resolved or withdrawn are hereby overruled on their merits. This Order shall be valid, binding on all parties-in-interest and fully effective immediately upon entry.

2.      Jurisdiction; Venue. The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D). Venue of these Chapter 11 Cases and the Motion is proper under 280 U.S.C. §§ 1408 and 1409.

3.      Purpose and Necessity of Financing. RRLP requires the financing described in the Motion to fund its operations pending a sale of some or all of the Shopping Center pursuant to a Plan of Reorganization. RRLP is unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Loan Documents within the time frame required by its needs to avoid immediate and irreparable harm. A loan facility in the amount and in the manner provided by the DIP Loan Documents is not available to , generally, without granting to the Lender pursuant to sections 364(c)(1), (2) and 364(d) of the Bankruptcy Code, the following: (i) a superpriority administrative expense status, having priority over any and all administrative expenses of the kind specified in, or arising or ordered under sections 503(b) and 507(b) of the Bankruptcy Code, and (ii) a first priority, perfected security interests in and liens on all Assets, (iii) secured by

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

perfected priming liens on all Assets, priming all existing secured creditors, including without limitation, Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, provided, however, that the claims and liens arising under clauses (i), (ii) and (iii) above are subject to the Carve-Out. After considering all the alternatives, RRLP has concluded in the exercise of its prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best financing available to .

4.    Good Cause. RRLP's ability to obtain sufficient liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors because the Debtors need to continue to operate their businesses pending a sale of some or all of the Shopping Center pursuant to a Plan of Reorganization. The preservation of the going concern value of the Debtors' businesses is the linchpin to any successful reorganization. The Debtors' estates will be immediately and irreparably harmed if this Order is not entered. Good cause thus has been shown for the relief sought in the Motion.

5.    Good Faith. The terms of the DIP Loan Documents, including the interest rates and fees applicable thereto, are at least as or more favorable to RRLP as those available from alternative sources. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length between RRLP and the Lender. The DIP Loan and other financial accommodations made to RRLP by the Lender pursuant to this Order, the DIP Loan Agreement and the other DIP Loan Documents shall be deemed to have been extended by the Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the Lender shall be entitled to all protections afforded thereby. The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect RRLP's exercise of

prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

6. Superpriority Claim and Lien Priority.

(a) The Lender is hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in the aggregate principal amount of up to $3,100,000, together with all interests, fees and other amounts payable pursuit to the DIP Loan Documents, having priority over any and all administrative expenses of the kind specified in or arising under sections 503(b) and 507(b) (except as otherwise expressly provided for in the Carve-Out). The Superpriority Claim does not extend to proceeds from Avoiding Power Causes of Action.

(b) Further, as security for the DIP Obligations, in accordance with the terms of the DIP Loan Documents and this Interim Order, effective immediately, the Lender is hereby granted a first priority, perfected security interests in and liens on all unencumbered pre-petition and post-petition property of RRLP (excluding the Avoiding Power Causes of Action).

(c) As security for the DIP Obligations, in accordance with the terms of the DIP Loan Documents and this Interim Order, effective immediately, the Lender is hereby granted, pursuant to sections 364(c) and (d) of the Bankruptcy Code, perfected priming liens in the Assets (the "Post-Petition Liens"), senior in all respects to any and all present and future liens, claims, interests or encumbrances, if any, including, without limitation, any and all pre-petition and post-petition liens and security interests held by Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R or RGE, as further described in the DIP Loan Agreement.

(d) No lien or security interest granted to the Lender under this Order or the DIP Loan Documents, as approved by this Order, shall (i) be subject to any lien or security interest

that is avoided and preserved for the benefit of RRLP's estate under section 551 of the Bankruptcy Code or (ii) hereafter be subordinated to or made *pari passu* with any other lien or security interest pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise. The Post-Petition Liens arising hereunder shall be and hereby are fully perfected security interests, such that no additional steps need be taken by the Lender to perfect such interests.

(e) The Post-Petition Liens and Superpriority Claim granted to the Lender under this Order shall continue in this and in any superseding case for RRLP under any chapter of the Bankruptcy Code, and such liens and security interests shall maintain their priority as provided in this Order until all the DIP Obligations have been paid in full. In addition, and in furtherance of the rights of the Lender under the DIP Loan Documents and this Order, neither Warren Bank, Carmen, SSJC, FRRC, MCANY II, BLG, C&R nor RGE, nor any of their successors or assigns, shall seek to enforce, or otherwise exercise any of their rights and remedies in respect of, the liens held by them in any of the Assets unless and until the DIP Obligations have been indefeasibly paid in full and the DIP Loan Documents have been terminated.

7.      Adequate Protection.  The adequate protection regime proposed by RRLP in the Motion is approved as follows:

(a) Property Taxes.  RRLP is directed to place a portion of the DIP financing proceeds, $200,000, into an escrow account controlled by its counsel for the purpose of paying any unpaid real property taxes which were due as of the RRLP Petition Date (the "Unpaid Taxes"). The Macomb County Michigan Treasurer's Office and the Office of the City Treasurer for the City of Richmond, Michigan are hereby granted a replacement lien on such account in an amount sufficient to cover the Unpaid Taxes.  Once the Unpaid Taxes are paid, any remaining amounts in this account shall be returned to RRLP

for the purpose of paying administrative and general operating expenses in these bankruptcy cases. RRLP shall settle an order relating to the payment of the property taxes.

(b) Warren Bank Lien/Carmen Lien. RRLP is directed to place a portion of the DIP financing proceeds, $2,016,658.17 into an escrow account controlled by its counsel for the purpose of paying the Warren Bank Lien. Any payment to Warren Bank by RRLP shall have the effect of reducing, on a dollar for dollar basis, any liability owed by RRLP under both the Warren Bank Lien and the Carmen Lien and, upon full payment of the Warren Bank Lien, all security documents executed by RRLP in favor of either Warren Bank or Carmen I connection with the Warren Bank Liens shall be cancelled and deemed null and void. Warren Bank is hereby granted a replacement lien on this account and, immediately upon the funding of this account, any security interest of Warren Bank or Carmen in the leases, rents or profits from the Shopping Center shall cease and such rents and profits shall thereafter be paid pursuant to the Intermediate Lease and Servicing Agreement, as set forth in this Court's August 9, 2006 Order approving that certain June 26, 2006 Stipulation Resolving Claims, except with respect to the rents paid by Kmart, which shall be paid in accordance with the DIP Loan Agreement. RRLP shall settle an order relating to the payment of the Warren Bank Lien/Carmen Lien.

(c) SSJC Lien. RRLP is directed to pay, upon the closing of the DIP Loan, a portion of the DIP financing proceeds, $450,000.00, to SSJC as partial satisfaction of the SSJC Lien. This payment shall not alter the continued effect of the SSJC Lien on the Shopping Center, as primed, by the Lender's Superpriority liens granted herein.

8.      Acknowledgements. In providing for post-petition financing under the DIP Loan Agreement, RRLP acknowledges, represents, stipulates and agrees that:

(a) RRLP has obtained all authorizations, consents and approvals required to be obtained from, and has made all filings with and given all notices required to be made or given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which RRLP is a party;

(b) in entering into the DIP Loan Documents, and as consideration therefor, RRLP hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Agreement, RRLP shall not in any way prime or seek to prime the liens provided to the Lender under this Order or the DIP Loan Documents in the Collateral by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise;

(c) in entering into the DIP Loan Documents, and as consideration therefor, RRLP hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Agreement, RRLP shall not in any way or at any time, suffer to exist a priority for any administrative expense or unsecured claim against RRLP of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, sections 503(b) and 507(b) of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the DIP Obligations, as provided herein;

(d) there are no other liens on or security interests in the Collateral except for the Permitted Liens and the liens held by the Lender.

9.     Fees. All fees payable and costs and/or expenses reimbursable under the DIP Loan Agreement and other DIP Loan Documents by RRLP to the Lender, are hereby approved and shall be promptly paid in full by RRLP in accordance with this Order and the DIP Loan Documents, and RRLP is hereby authorized to pay all such fees without the necessity of RRLP or the Lender filing any further application with the Court for approval or payment of such fees or expenses. All fees and costs and/or expenses payable by RRLP in connection with the recording, filing and insuring of financing statements, mortgages and financing statements, if any, to confirm the perfection of the security interests granted or authorized by this Order are hereby approved and shall be promptly paid in full by RRLP without the necessity of RRLP or the Lender filing any further application with the Court for approval or payment of such fees, costs and/or expenses.

10.     Authority to Execute and Deliver Necessary Documents. RRLP is hereby authorized and empowered to enter into and deliver the DIP Loan Agreement in the form annexed hereto and the other DIP Loan Documents. RRLP is hereby further authorized, empowered and directed (a) to perform all of its obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in the DIP Loan Documents as approved by this Order, (b) to perform all acts required under the DIP Loan Documents and this Order, including, without limitation, and when applicable, the payment of all principal, interest, charges, fees, and the reimbursement of present and future reasonable costs and expenses paid or incurred by the Lender as provided for in this Order, the DIP Loan Agreement, and the other DIP Loan Documents, all of which unpaid principal, interest, charges, fees and the reimbursement of present and future reasonable costs and expenses shall be included and constitute part of the

principal amount of the DIP Obligations, be deemed a Superpriority Claim having the same priority as all other DIP Obligations hereunder and be secured by a first priority lien on and security interest in all of the Collateral as and to the extent provided for in this Interim Order, the DIP Loan Agreement, and the other DIP Loan Documents, and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be required or necessary for RRLP to perform all of its obligations under this Order and the DIP Loan Documents, without further order of the Court. The DIP Obligations shall constitute valid and binding obligations of RRLP in accordance with the terms of this Order.

11. Amendments. , only with the express written consent of the Lender, may enter into any amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or order of this Court, provided that (i) such modifications or amendments do not materially and adversely affect, in the reasonable view of RRLP, the rights of any creditor or other party-in-interest, (ii) notice of any such amendment or modification is filed with the Court, and (iii) notice of any such amendment or modification (other than those which in the reasonable view of RRLP are ministerial, technical or do not adversely affect RRLP), if any, are provided in advance to all parties having filed a notice of appearance pursuant to Bankruptcy Rule 2004 that was entered on the docket prior to the date of the filing of such amendment or modification with the Bankruptcy Court, and the Office of the U.S. Trustee.

12. Carve-Out Expenses. A Carve-Out from the liens and claims granted to the Lender will apply in the following circumstances: (a) in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), the payment of (i) accrued and unpaid professional fees and disbursements theretofore incurred as of the

occurrence and during the continuance of an uncured or un-waived Event of Default, and (ii) professional fees and disbursements incurred during the time of such continuance in an aggregate amount not in excess of $200,000, by RRLP and allowed by an order of the Bankruptcy Court under §§330 and 331 of the Bankruptcy Code; and (b) the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court (the "UST/Clerk Fees"). The DIP Loan Agreement provides that so long as no Event of Default (or event which with the giving of notice or lapse of time or both would constitute an Event of Default) has occurred, RRLP will be permitted to pay compensation and reimbursement of expenses allowed and payable under §§330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out.

13.    Additional Perfection Measures. The liens, security interests, and priorities granted to the Lender pursuant to this Order and the DIP Loan Documents with respect to certain property of RRLP's estate shall be perfected by operation of law immediately upon entry of this Order by the Court. Neither RRLP nor the Lender shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers or warehouseman waivers, if any, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office, or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interest and Post-Petition Liens granted pursuant to this Order. If the Lender, in its sole discretion, chooses to obtain consents from any licensor or similarly situated party-in-interest, to file financing statements, notices of lien or similar instruments, to record financing statements,

mortgages or deeds of trust, or to otherwise confirm perfection of such security interests and liens: (a) the Lender is authorized and empowered to file or record financing statements, mortgages, deeds of trust or similar instruments which secure the DIP Obligations up to the aggregate principal amount of $3,100,000, together with all interests, fees and other amounts payable pursuant to the DIP Loan Documents; (b) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Order; and (c) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder. In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Lender may, at its sole discretion, choose to file a true and complete copy of this Order in any place at which any such instruments would or could be filed, together with a description of the Collateral located within the geographic area covered by such place of filing, and such filing by the Lender shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Order.

14. **Payment of Administrative Expenses.** Notwithstanding the foregoing, shall be permitted to pay, as the same may become due and payable, but solely to the extent permitted by the DIP Loan Documents, (i) administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of its business, (ii) payments pursuant to "first day" orders entered by this Court, (iii) compensation and reimbursement of expenses to professionals allowed and payable under section 331 of the Bankruptcy Code, and (iv) subject to the requirements of the Bankruptcy Code, any other administrative expenses and payments permitted under the DIP Loan Agreement.

15.    Access to Information. Without limiting the rights of access and information afforded to the Lender under the DIP Loan Agreement and other DIP Loan Documents, RRLP shall permit representatives, agents and/or employees of the Lender to have reasonable access to its premises and its records during normal business hours (without unreasonable interference with the proper operation of RRLP's business) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

16.    Cash Management System. RRLP is authorized and directed to maintain its cash management system in a manner consistent with the DIP Loan Documents.

17.    Automatic Stay Modified. The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lender:

(a) upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, or any default of a provision of this Order, and after thirty (30) business days' prior written notice to the counsel for Debtors and the United States Trustee, to declare all or any portion of the DIP Loan then outstanding to be immediately due and payable and exercise all other enforcement rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents, this Order, or under other applicable bankruptcy and non-bankruptcy law without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated as provided herein without the necessity of any further action by the Court in the event that the Debtors and/or the U.S. Trustee have not obtained an order from this Court to the contrary within fifteen (15) business days after receiving such notice from the Lender pursuant to this Order. The Debtors and/or the U.S. Trustee shall have the

burden of proof at any hearing on any request by them to re-impose or continue the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default has occurred and is continuing;

(b) this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested;

(c) upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, the Lender may, without providing any prior notice thereof, immediately charge default interest at the rate set forth in the DIP Loan Agreement; and

18.    No Responsible Person. In making the decision to make the DIP Loan, administering the DIP Loan, and extending any other financial accommodations to RRLP under the DIP Loan Agreement or to collect the indebtedness and obligations of RRLP, the Lender shall not be considered to be exercising control over any operations of RRLP or acting in any way as a responsible person, an owner or an operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

19.    Successors and Assigns. The DIP Loan Documents and the provisions of this Order shall be binding upon the Lender, RRLP and their respective successors and assigns, and shall inure to the benefit of the Lender and RRLP and their respective successors and assigns

15

including, without limitation, any trustee, responsible officer, examiner with expanded powers, estate administrator or representative, or similar person appointed in a case for RRLP under any chapter of the Bankruptcy Code.

20.     No Third Party Beneficiary. Except with respect to the Debtors, the Lender, its delegates, successors and assigns, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

21.     Binding Nature of Agreement. Each of the DIP Loan Documents to which RRLP is and will become a party shall constitute legal, valid and binding obligations of RRLP, enforceable against RRLP in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the Lender by RRLP. The rights, remedies, powers, privileges, liens and priorities of the Lender provided for in this Interim Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in this case or in any subsequent case under the Bankruptcy Code, unless and until the DIP Obligations have first been paid in full and completely satisfied.

22.     Subsequent Reversal or Modification. This Order is entered pursuant to section 364 of the Bankruptcy Code, granting the Lender all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by RRLP to the Lender prior to the date of receipt by the Lender of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition

indebtedness, obligation or liability incurred by RRLP to the Lender prior to written notice to the Lender of the effective date of such action shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligation or liability.

23. **No Waiver.** This Order shall not be construed in any way as a waiver or relinquishment of any rights that the Lender may have to bring or be heard on any matter brought before this Court.

24. **Conversion/Dismissal.** No motion shall be filed by RRLP for, and no order dismissing or converting this Chapter 11 case under section 1112 of the Bankruptcy Code or appointing a chapter 11 trustee or an examiner with expanded powers shall be entered, unless and until the DIP Obligations shall have been indefeasibly paid in full and completely satisfied. If an order dismissing this case under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (x) the liens, security interests, and Superpriority Claims granted to the Lender hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full and completely satisfied, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Superpriority Claims of the Lender, as the case may be.

25. **Injunction.** Except as provided in the DIP Loan Agreement and this Order, RRLP shall be enjoined and prohibited from, at any time during the Chapter 11 Case, (a) granting liens in the Collateral or portion thereof to any other parties, pursuant to section 364(d) of the

Bankruptcy Code or otherwise, which liens are senior to, on a parity with or junior to the liens of the Lender and/or (b) (i) using the Collateral, and (ii) applying to any Court for an order authorizing the use of the Collateral, except in accordance with the DIP Loan Agreement.

26. Survival. Unless and until the DIP Obligations have been indefeasibly paid in full, (a) the protections afforded to the Lender under this Order, and any actions taken pursuant thereto shall survive the entry of an order (i) confirming a plan of reorganization; (ii) dismissing this case or (iii) converting this case into a case pursuant to chapter 7 of the Bankruptcy Code, (b) the Post-Petition Liens in and to the Collateral and the Superpriority Claim shall continue in these proceedings, in any such successor case or after any such dismissal. The Post-Petition Liens and Superpriority Claim shall maintain their validity and priority as provided by this and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of Indebtedness or any conversion of any of this Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of this Chapter 11 Case, by any act or omission until the DIP Obligations have been indefeasibly paid in full.

27. Priority of Terms. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Agreement or the DIP Loan Documents, the terms and provisions of this Order shall govern.

28. Adequate Notice. The notice given by the Debtors of the hearing on the Motion was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this

Court. Under the circumstances, no other or further notice of the request for the relief granted at the hearing on the Motion is required.

29.    Waiver of Requirement to File Memorandum of Law. The Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the requirement contained in Rule 9013-1 (b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted, is hereby waived.

30.    Entry of Order; Effect. This Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Order on the Court's docket in this Chapter 11 Case.

Dated: New York, New York
    _____

                                        _____
                                        James M. Peck
                                        United States Bankruptcy Judge